**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SPROUT HEALTH, LLC,<br><br>      Plaintiff,<br><br>vs.<br><br>RSUI INDEMNITY COMPANY,<br><br>      Defendant. | Civ. Action No. 19-12426 (FLW)<br><br>**OPINION** |

**WOLFSON, Chief Judge:**

  In this insurance coverage dispute, the plaintiff, Sprout Health, LLC ("Sprout"), seeks to impose a duty to defend on its liability insurer, RSUI Indemnity Company ("RSUI"), with respect to a lawsuit filed against Sprout by American Addiction Centers ("AAC"). Sprout, a company that provides addiction recovery services and is a competitor to AAC, was sued under a range of causes of action stemming from the alleged misappropriation of proprietary customer information by employees of AAC who were allegedly working with an employee of Sprout. RSUI declined coverage under an insurance policy that was issued to Sprout, concluding that the policy excluded coverage for the claims at issue in AAC's lawsuit. In response, Sprout brought the instant action, asserting that RSUI wrongfully denied defense and indemnity coverage. RSUI now moves for summary judgment as to its liability. For the reasons that follow, RSUI's motion is **GRANTED**.

**I.  RELEVANT FACTS**

  The following facts are drawn from RSUI's statement of material facts, which RSUI submitted with its motion for summary judgment pursuant to Rule 56.1 of the Federal Rules of

Civil Procedure.  (*See* Statement of Material Facts Not in Dispute in Support of RSUI Indemnity Company's Motion for Summary Judgment ("SMF"), ECF No. 14-18.)

### A. The AAC Complaint

On August 31, 2017, AAC filed a complaint (the "AAC Complaint") against Sprout and three individual defendants, Kenny Acton, Matthew Howe, and Jacob Alonzo, in the Superior Court of California, County of San Diego, entitled *American Addiction Centers, Inc. v. Sprout Health, LLC, et al.*, Case No. 37-2017-00032334-CU-BT CTL.  (SMF ¶ 9; *see also* AAC Compl., ECF No. 14-3.)  As alleged in the AAC Complaint, AAC provides addiction recovery services and competes with Sprout.  (SMF ¶ 10 (citing AAC Compl. ¶¶ 4-5, 28).)  AAC obtains clients through Rehabs.com, a website operated by an AAC subsidiary, Recovery Brands.  (SMF ¶¶ 11 (citing AAC Compl. ¶¶ 15-16, 42).)  Rehabs.com processes and stores information from potential leads interested in addiction recovery services.  (SMF ¶¶ 15-17 (citing AAC Compl. ¶ 16-17, 23).)  Details regarding Recovery Brands' phone calls with potential leads are recorded and stored in a confidential software program called CallRail. (*Id.*)  The program tracks information relating to calls between Recovery Brands' employees and potential leads.  (*Id.*)

The AAC Complaint alleged that two employees of Recovery Brands, Matthew Howe and Jacob Alonzo, conspired with an alleged employee of Sprout, Kenny Acton, to steal data from CallRail consisting of lists or logs of promising leads—*i.e.*, caller information for telephone calls that lasted in excess of 10 minutes.  (SMF ¶ 18 (citing AAC Compl. ¶ 22).)  The AAC Complaint further alleged that Howe and Alonzo sold proprietary caller data obtained from CallRail to Acton. (SMF ¶ 19 (citing AAC Compl. ¶¶ 27, 32).)  The AAC Complaint asserted that Acton purchased these leads from Alonzo and Howe on behalf of Sprout, and that Sprout benefited from the misappropriated information by gaining clients, while AAC experienced a reduction in business and revenue.  (SMF ¶¶ 19-21 (citing AAC Compl. ¶¶ 27, 31-32, 37-38).)

The AAC Complaint set forth multiple causes of action to support its claims for relief against Sprout, including, as relevant here: (1) a statutory cause of action for violation of the California Uniform Trade Secret Act (the "CUTSA count"), Cal. Civ. Code § 3426 *et seq.*; and (2) a cause of action for negligence under California common law (the "negligence count").[1] (SMF ¶¶ 22, 26 (citing AAC Compl. ¶¶ 39-48, 54-60.)  In the CUTSA count, AAC alleged that information concerning potential leads constituted proprietary and confidential proprietary trade secrets, and that Sprout and the other individual defendants (*i.e.*, Howe, Alonzo, and Acton) misappropriated or threatened to misappropriate AAC's trade secrets.  (SMF ¶ 23-24 (citing AAC Compl. ¶¶ 39-48).)  In the negligence count, AAC alleged that Sprout had a duty to supervise and monitor its alleged employee, Acton; that Sprout breached its duty to supervise and monitor Acton by allowing him to purchase leads that he did not generate; and that Sprout's breach caused harm to AAC in the form of lost business and decreased expected revenue.  (SMF ¶¶ 27-29 (citing AAC Compl. ¶¶ 2-3, 54-60.)

B. **The Insurance Policy**

Prior to the filing of the AAC Complaint, Sprout purchased a Directors and Officers Liability insurance policy from RSUI (the "Policy"), which provides coverage for the period from August 10, 2016 to August 10, 2017.  (SMF ¶ 1.)  The Policy has an aggregate limit of liability of $1,000,000, and provides entity coverage to Sprout, as an "Insured Organization," if "a Claim for a Wrongful Act is first made against the Insured Organization during the Policy Period and reported in accordance with Section V. – Condition, C. Notice of Claim or Circumstance of th[e]

---

[1] The AAC Complaint also sets forth three additional causes of action against Sprout for breach of contract, interference with a prospective business contract, and unfair competition.  However, Sprout has conceded that these other causes of action are excluded from coverage under the insurance policy and, therefore, do not trigger a duty to defend by RSUI.  (*See* Pl. Opp. at 1, ECF No. 18.)

policy." (SMF ¶¶ 2-3.) The definition of a "Claim" under the Policy includes, in relevant part: "A written demand for monetary or non-monetary relief; [or] [a] civil, criminal, administrative, regulatory or arbitration proceeding for monetary or non-monetary relief which is commenced by . . . [r]eceipt or service of a complaint or similar pleading[.]" (SMF ¶ 4.) In addition, the Policy provides coverage for "Defense Expenses," which are defined as "reasonable and necessary legal fees and expenses incurred, with the Insurer's consent, by any Insured in defense of a Claim, including any appeal therefrom." (SMF ¶ 6.)

The Policy also contains a number of exclusions, which operate to bar coverage for a Claim that would otherwise trigger coverage. The exclusion at issue in the present motion is Exclusion 13, which is found at Section IV of the Policy. Exclusion 13 states, in relevant part:

> The Insurer shall not be liable to make any payment for Loss in connection with any Claim made against any Insured:
>
> \*   \*   \*
>
> 13.   With respect to INSURING AGREEMENT C. of this policy, only:
>
>    a.   For actual or alleged plagiarism, misappropriation, infringement or violation of copyright, patent, trademark, secret or any other intellectual property rights;
>
>    b.   For actual or alleged violation of any law, whether statutory, regulatory or common law, with respect to any of the following activities: anti-trust, business competition, unfair trade practices or tortuous interference in another's business or contractual relationships; or
>
>    c.   Alleging, arising out of, based upon or attributable to, in whole or in part, any liability under or pursuant to any contract or agreement, whether oral, written, express or implied, including the liability of others assumed by an Insured, unless such Insured would have been liable in the absence of such contract or agreement; provided, this EXCLUSION shall not apply to Defense Expenses in connection with an Employment Practices Claim.

(SMF ¶ 8.)

### C. RSUI's Coverage Position

Sprout tendered notice of the AAC Complaint to RSUI on September 7, 2017. (SMF ¶ 37.) On September 22, 2017, RSUI denied defense and indemnity coverage to Sprout pursuant to Exclusion 13. (SMF ¶ 38-42.) In its coverage correspondence with Sprout, RSUI acknowledged that the AAC Complaint constituted a "Claim" alleging a "Wrongful Act" against Sprout such that coverage under the Policy was triggered subject to any applicable exclusions. (SMF ¶ 39.) However, RSUI determined, based upon the allegations in the AAC Complaint, that Exclusion 13 nevertheless barred coverage. (SMF ¶ 42.) Specifically, RSUI stated the following in its correspondence with Sprout: "With respect to Sprout, the [AAC Complaint] alleges misappropriation of trade secrets, interference with business contract, and unfair competition. As such Section IV. Exclusion 13 precludes coverage, both defense and indemnity, with respect to Sprout for this matter." (*Id.*)

Sprout's broker subsequently issued letters on Sprout's behalf challenging RSUI's coverage denial. (SMF ¶¶ 43-44.) Sprout's broker argued that RSUI owed defense and indemnity coverage to Sprout because Exclusion 13 did not preclude coverage for the negligence count in the AAC Complaint. (SMF ¶ 44.) In response, RSUI issued supplemental coverage letters reaffirming its position in letters dated December 4, 2018 and December 19, 2018. (SMF ¶¶ 45, 50.) Furthermore, in an email dated December 5, 2018, RSUI specifically responded to the arguments of Sprout's broker regarding the application of Exclusion 13 to the AAC Complaint. RSUI stated in the email: "This is not a situation where the negligence cause of action is simply tangentially related to the misappropriation/unfair trade practices allegations; rather, the misappropriation of AAC's trade secrets is the essence of the negligence cause of action against Sprout. The negligence cause of action does not exist absent the misappropriation allegations." (SMF ¶ 47.) On April 4,

5

2019, Sprout's counsel issued a letter to RSUI demanding that RSUI reconsider its coverage position and acknowledge defense coverage for Sprout. (SMF ¶ 51.)

### D. The Instant Action and Present Motion

On April 22, 2019, Sprout commenced the instant action by filing the operative complaint in the Superior Court of New Jersey, Law Division, Monmouth County. (*See* Compl., ECF No. 1-1.) RSUI subsequently removed the action to federal court on the basis of diversity jurisdiction pursuant to 28 U.S.C. § 1332(a). (*See* Not. of Removal, ECF No. 1.) In its complaint, Sprout alleges that RSUI breached the Policy by wrongfully denying defense and indemnification coverage to Sprout for the claims alleged in the AAC Complaint. (*See* Compl., ECF No. 1-1.) On October 17, 2019, RSUI filed the present motion, in which RSUI argues that that it is entitled to summary judgment because the claims in the AAC Complaint are excluded from coverage under Exclusion 13 of the Policy. (*See* Def. Mot., ECF No. 14.) In opposing RSUI's motion, Sprout concedes that that the CUTSA count falls within Exclusion 13; however, Sprout argues that RSUI still owes defense and indemnity coverage to Sprout because Exclusion 13 does not preclude coverage for the negligence count in the AAC Complaint. (*See* Pl. Opp., ECF No. 18.)

## II.   LEGAL STANDARDS

Summary judgment is appropriate if the moving party can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine if a reasonable jury could find for the non-moving party, and the dispute is material if it will affect the outcome of the trial under governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007). Moreover, "[a]s a federal court sitting in diversity," the Court is "required to apply the substantive law of the state whose laws govern the action." *Norfolk*

6

*S. Ry. Co. v. Basell USA Inc.*, 512 F.3d 86, 91 (3d Cir. 2008) (citation omitted). The Court "accomplish[es] this task by . . . applying the precedents of the [state's highest court] that are on point." *Id*. (citation omitted). However, "[i]n the absence of guidance from the state's highest court," the Court "must look to decisions of state intermediate appellate courts, of federal courts interpreting that state's law, and of other state supreme courts that have addressed the issue, as well as to analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand." *Id*. (citations and internal quotation marks omitted).

### III.     DISCUSSION

In this case, the parties appear to agree that no factual disputes exist that would affect the outcome; rather, the sole question is whether, as a matter of law, the Policy imposed a duty upon RSUI to defend Sprout against the AAC Complaint based upon the negligence count. Furthermore, the parties agree that this question is governed by Delaware law, under which "[t]he proper construction of any contract, including an insurance contract, is purely a question of law." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992) (citation omitted).[2]

In Delaware, courts afford "clear and unambiguous language in an insurance policy . . . its ordinary and usual meaning." *Id*. This principle of policy interpretation is equally applicable to the interpretation of insurance policy exclusions. *See e.g., Scottsdale Ins. Co. v. Lankford*, 2007 WL 4150212, at *8 (Del. Super. Ct. Nov. 21, 2007), *aff'd*, 947 A.2d 1121 (Del. 2008) (holding that an unambiguous assault and battery exclusion barred coverage for negligent supervision

---

[2]     I note that while Sprout denies several of the assertions set forth in RSUI's statement of material facts (*see* Pl. Resp. to Def.'s Statement of Material Facts, ¶¶ 9, 16, 29, 56, 66, 72, 74-76, ECF No. 18-1), those denials are do not affect the resolution of the purely legal issue that is before the Court.

claim). However, "[b]ecause an insurance policy is a contract of adhesion . . . ambiguous language is construed most strongly against the insurer, and the policy will be read in a way that satisfies the reasonable expectations of the average consumer." *Cont'l Ins. Co. v. Burr*, 706 A.2d 499, 500-01 (Del. 1998); *see also Hallowell v. State Farm Mut. Auto. Ins. Co.*, 443 A.2d 925, 926 (Del. 1982) ("[A]n insurance contract is construed strongly against the insurer, and in favor of the insured, because the insurer drafted the language that is interpreted.") (citations omitted).

An insurer's duty to defend an insured arises as soon as the allegations of the underlying complaint "show a potential that liability within coverage will be established." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. Rhone-Poulenc Basic Chemicals Co.*, 1992 WL 22690, at *7 (Del. Super. Ct. Jan. 16, 1992) (citation omitted). The insurer "can be excused from its duty to defend only if it can be determined as a matter of law that there is no possible factual or legal basis upon which the insurer might eventually be obligated to indemnify the insured." *Id*. (citation omitted). In other words, the insurer must show that the allegations of the underlying complaint are "'solely and entirely' within specific and unambiguous exclusions from coverage." *Id*. (quoting *Avondale Indus., Inc. v. The Travelers Indem. Co.*, 887 F.2d 1200, 1204 (2d Cir. 1989)). Once the duty to defend is triggered by at least one count, the duty extends to the entire lawsuit. *Consol. Rail Corp. v. Liberty Mut. Ins. Co.*, 2005 WL 697943, at *3 (Del. Super. Ct. Mar. 16, 2005) ("[T]he duty to defend extends to all causes of action in a complaint as long as one cause of action is potentially covered") (emphasis added); *see also Keystone Ins. Co. v. Walls*, 2006 WL 1149143, at *6 (Del. Super. Ct. Jan. 31, 2006) (noting that "every allegation of the underlying complaint must fall solely and entirely within a specific and unambiguous exclusion from coverage") (citation and internal quotation marks omitted).

The test to determine an insurer's duty to defend is "whether the underlying complaint, read as a whole, alleges a risk within the coverage of the policy." *ConAgra Foods, Inc. v. Lexington Ins. Co.*, 21 A.3d 62, 73 (Del. 2011) (citation omitted). Whether an insurance company must defend its policyholder requires adherence to the following principles:

(1) where there exists some doubt as to whether the complaint against the insured alleges a risk insured against, that doubt should be resolved in favor of the insured;

(2) any ambiguity in the pleadings should be resolved against the carrier; and

(3) if even one count or theory of plaintiff's complaint lies within the coverage of the policy, the duty to defend arises.

*Pacific Insurance Co. v. Liberty Mutual Insurance Co.*, 956 A.2d 1246, 1254-55 (Del. 2008). Importantly, when analyzing coverage, a court is neither bound by the narrow language in a complaint nor "plaintiff's unilateral characterization of the nature of the claims." *Blue Hen Mech., Inc. v. Atl. States Ins. Co.*, 2011 WL 1598575, at *2 (Del. Super. Ct. Apr. 21, 2011), *aff'd*, 29 A.3d 245 (Del. 2011); *Scottsdale*, 2007 WL 4150212 at *8 ("The Court cannot lose sight of the plain meaning of the language in the insurance policy by the Individual Defendants' resourcefulness in their artful pleadings."). Instead, a court analyzing whether a complaint alleges a covered claim should "review the complaint as a whole, considering all reasonable inferences that may be drawn from the alleged facts." *Blue Hen*, 2011 WL 1598575, at *2. However, Delaware law limits the determination of an insurer's duty to defend to the allegations in the complaint and does not permit the introduction of extrinsic evidence by either party on this issue. *Premcor Ref. Grp. v. National Fire Insurance Co. of Hartford*, 855 F. Supp. 2d 237 (D. Del. 2012) ("Delaware law is inclined against looking beyond the pleadings to determine whether a duty to defend exists."); *see also Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 552 (5th Cir. 2004) ("The duty to

9

defend analysis is not influenced by facts ascertained before the suit, developed in the process of litigation, or by the ultimate outcome of the suit.")[3]

In this case, having reviewed the AAC Complaint as a whole, I find that the negligence count is a claim for misappropriation of trade secrets that falls squarely and entirely within Exclusion 13 of the Policy. The negligence count in the AAC Complaint alleged that Sprout breached its duty to supervise and monitor its employee, Acton, by allowing him to purchase leads that he did not generate. (SMF ¶¶ 26-29 (citing AAC Compl. ¶ 2-3, 54-60).) The negligence count further alleged that (a) Acton had a duty to obtain leads in a lawful manner, (b) Acton breached his duty to obtain leads in a lawful manner by failing to investigate the leads that he was purchasing, and (c) both Sprout and Acton knew, or should have known, that the leads were not obtained lawfully. *Id*. Although the negligence count does not use the exact words "misappropriation of trade secrets," a plain reading of the AAC Complaint "as a whole" makes clear that AAC alleged Sprout breached its duty to supervise and monitor Acton by allowing him to purchase leads in an unlawful manner—*i.e.*, by misappropriating AAC's trade secrets.

Indeed, when analyzed in terms of the allegations in the AAC Complaint that precede the negligent supervision count—all of which are incorporated by reference in the negligent

---

[3] In its brief in support of the present motion, RSUI notes that Sprout previously argued, during motion practice before the Superior Court of California in the underlying action, that the negligence count in the AAC Complaint was not supported by any "independent facts" and was "expressly based" on the CUTSA count for misappropriation of trade secrets. (*See* Def. Br. at 22-23.) In this case, RSUI argues that Sprout "is bound by this characterization and cannot now assert in contradictory fashion that the AAC Complaint is anything but a claim for misappropriation of trade secrets." (*Id.*) However, even assuming that Sprout's earlier arguments contradict its present arguments to this Court, the earlier arguments were made after RSUI had already denied coverage and, therefore, are extrinsic to the allegations in the AAC Complaint. Moreover, Sprout's earlier arguments were made in reference to an entirely different legal issue, *i.e.*, whether all of the counts in the AAC Complaint arose from the "same nucleus of facts" for preemption purposes. Here, in contrast, the issue is whether the allegations in the AAC Complaint supporting the negligence count "show a potential that liability within coverage will be established." *Rhone-Poulenc*, 1992 WL 22690 at *7. Accordingly, Sprout's earlier arguments to the Superior Court of California are irrelevant to, and do not influence, my analysis in this case.

supervision count—it is evident that purchasing leads in an unlawful manner and failing to supervise an employee who purchased leads in an unlawful manner refer to the same claim: misappropriation of trade secrets. "Leads," as used in the AAC Complaint, refers to prospective client information—or client lists—obtained from AAC's confidential software program. (SMF ¶ 15 (citing AAC Compl. ¶ 16), SMF ¶ 17 (citing AAC Compl. ¶ 23.) The AAC Complaint alleged that these "leads" constituted AAC's proprietary business and customer information and that the "leads" met the definition of a "trade secret" as defined by the California Civil Code. (SMF ¶ 23 (citing AAC Compl. ¶ 40).) Because the "leads" at issue in the AAC Complaint were alleged to be the trade secrets, the purchase of leads in an unlawful manner, in turn, refers to Acton and his alleged co-conspirators' conduct in misappropriating trade secrets, thereby causing economic harm to AAC. (SMF ¶¶ 18-21, 24.) Simply put, the negligence count alleged that Sprout was negligent for allowing Acton to purchase trade secrets in an unlawful manner, which harmed AAC precisely because its trade secrets were misappropriated.

Both parties cite to *WoodSpring Hotels LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 2018 WL 2085197 (Del. Super. Ct. May 2, 2018) for support. In *WoodSpring*, the Superior Court of Delaware determined that an exclusion in a D&O policy—which contained nearly identical language to the exclusion at issue in this case—did not bar coverage for certain counts that were linked to a statutory misappropriation of trade secrets count.[4] *Id*. at *13. In the underlying complaint in *WoodSpring*, the plaintiff had alleged, *inter alia*, that its competitor, WoodSpring Hotels, committed statutory violations by misappropriating "competitively sensitive" trade secrets

---

[4] The similarly-worded language in the exclusion at issue in *WoodSpring* stated, in relevant part: "The Insurer shall not be liable to make any payment for Loss in connection with any Claim made against an Insured . . . for any actual or alleged plagiarism, misappropriation, infringement or violation of copyright, patent, trademark, trade secret or any other intellectual property rights[.]" 2018 WL 2085197, at *3.

11

consisting of customer account information. *Id*. at \*4. The underlying complaint also asserted other causes of action, including for violation of the Federal Computer Fraud and Abuse Act ("CFAA"). *Id*. After WoodSpring notified its insurer of the underlying complaint, its insurer denied coverage under the D&O policy in reliance on the exclusion. *Id*. WoodSpring responded by commencing a declaratory judgment action seeking, in part, a declaration that a duty to defend was triggered because the CFAA count did not fall within the exclusion at issue. *Id*.

Although the court in *WoodSpring* ultimately determined that the exclusion did not bar coverage for the CFAA count, it did so only because it held that the CFFA count did not "rise or fall" with the misappropriation of trade secrets claims. *Id*. at \*12. The *WoodSpring* court explained that the CFAA count was "broader" than the statutory misappropriation count; and that to prevail on the CFAA count in the underlying action, the plaintiff only had to prove that the defendants unlawfully accessed the plaintiff's computer "to take anything of value—not just trade secrets." *Id*. at \*13. In other words, the CFAA count was not, as the *WoodSpring* court found, "directly contingent" upon the statutory misappropriation of trade secrets count. *Id*.; c*f. Lemko Corp. v. Fed. Ins. Co.*, 70 F. Supp. 3d 905, 920 (N.D. Ill. 2014) (holding, in part, that "purportedly independent claims" of usurpation, tortious interference, civil conspiracy, and CFAA were "directly contingent" on underlying complaint's allegations of misappropriation of trade secrets and were therefore excluded by D&O Policy's exclusion language).

Here, in contrast to the CFAA claim in *WoodSpring*, the negligence count in the AAC Complaint is "directly contingent," and "rises or falls" with the statutory claim for misappropriation of trade secrets. Under California law (by which the negligence count in the AAC complaint was brought), when a plaintiff alleges that an employer is liable for negligent supervision based upon an employee's misappropriation of trade secrets, there must be a showing

that the particular harm of trade secret misappropriation actually materialized. *See Callaway Golf Co. v. Dunlop Slazenger Grp. Ams.*, Inc., 318 F. Supp. 2d 216, 220-21 (D. Del. 2004) (discussing a claim for negligence based upon an employee's misappropriation of trade secrets under California law) (citing *Doe v. Capital Cities*, 50 Cal. App. 4th 1038, 1054 (1996)). Thus, a necessary element of the AAC Complaint's negligence count was the misappropriation of trade secrets. In other words, to prevail on the negligence count, it would have been necessary for AAC to prove that Acton misappropriated trade secrets. *Id. at* 216. ("In short, if [Plaintiff] loses its misappropriation claim with respect to the [alleged trade secrets], it could not recover on its negligence claim."). Given the foregoing, it is clear that the negligence count is "directly contingent" upon, and "rises or falls" with, the claim for misappropriation of trade secrets and, therefore, is barred from coverage by Exclusion 13 of the Policy.[5]

## IV. CONCLUSION

In summary, I find that the negligence count in the AAC Complaint constitutes a claim for misappropriation of trade secrets and, therefore, is excluded from coverage by Exclusion 13 of the

---

[5] In its opposition papers, Sprout additionally argues that subsection (a) of Exclusion 13 should be interpreted narrowly to cover only those causes of action specifically enumerated in that subsection—*e.g.*, plagiarism, misappropriation, or infringement of copyrights, patents, trademarks, or trade secrets—and not causes of action for negligence. In support of this argument, Sprout notes that the prefatory language in subsection (a) contains the preposition "for" instead of the broader "arising out of" prefatory language used in subsection (c) of Exclusion 13. However, even assuming that the "for" formulation in subsection (a) is narrower than the "arising out of" formulation, that language merely narrows the scope of subsection (a) to the claims involving the harms or injuries enumerated in the exclusion, and not necessarily to any specific cause of action. *See Res. Bank v. Progressive Cas. Ins. Co.*, 503 F. Supp. 2d 789, 796 (E.D. Va. 2007) (contrasting "for" and "arising out of" and holding that even if "a Claim for" prefatory language "somehow narrows the scope of [exclusion], it narrows it to claims involving the harms listed in the exclusion."). In this case, although the AAC Complaint asserted a specific cause of action for negligence against Sprout, the harm or injury that was alleged to have resulted from Sprout's negligence stemmed entirely from the alleged misappropriation of trade secrets. Therefore, the negligence count is still a claim "for" misappropriation of trade secrets and, therefore, comes within subsection (a) of Exclusion 13.

Policy.  Accordingly, RSUI's motion for summary judgment is **GRANTED**.  An appropriate Order accompanies this Opinion.

DATED:  May 15, 2020

/s/ Freda L. Wolfson
Hon. Freda L. Wolfson
U.S. Chief District Judge